IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 10, 2021 Session

## STATE OF TENNESSEE v. TIM GILBERT

**Appeal from the Circuit Court for Giles County
No. CR-14803    Stella Hargrove, Judge**

_____

### No. M2020-01241-CCA-R3-CD

_____

The defendant, Tim Gilbert, appeals his Giles County Circuit Court Jury convictions of aggravated assault, reckless endangerment, unlawful possession of a weapon by a convicted felon, and resisting arrest, challenging the sufficiency of the convicting evidence and the rulings of the trial court permitting the State to amend the indictment and to admit the pretrial statement of a State's witness as substantive evidence in violation of the rule against hearsay.  The defendant also argues that permitting both the grand and petit juries to deliberate in a room in the Giles County Courthouse maintained by the United Daughters of the Confederacy ("U.D.C.") and adorned with various mementos of the Confederacy exposed the jury to extraneous prejudicial information and violated his constitutional rights to a fair trial conducted by an impartial jury, due process, and equal protection under the law.  The trial court did not err by permitting the State to amend the indictment because the amendment did not allege a new or different offense.  The court did err, however, by admitting the challenged witness statement, and that error cannot be classified as harmless.  Further, we conclude that the Confederate memorabilia in the jury room was extraneous information and that the State failed to rebut the presumption that the petit jury's exposure to that extraneous information was prejudicial.  Accordingly, we reverse the judgments of the trial court and remand the case for a new trial.

### Tenn. R. App. P. 3; Judgments of the Circuit Court Reversed and Remanded

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, and J. ROSS DYER, JJ., joined.

Evan Baddour, Pulaski, Tennessee, for the appellant, Tim Gilbert.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Brent Cooper, District Attorney General; and Rebecca S. Parsons, Assistant District Attorney General, for the appellee, State of Tennessee.

Jonathan Harwell, Richard Tennent, and Michael Working, Nashville, Tennessee, for the Amicus Curiae, Tennessee Association of Criminal Defense Lawyers.

**OPINION**

In April 2019, the Giles County Grand Jury charged the defendant with the aggravated assault of Rotosha Coffey, reckless endangerment, unlawful possession of a firearm after having been convicted of a felony, and resisting arrest for his conduct on December 24, 2018.

At the March 2020 trial, Ms. Coffey testified that on December 24, 2018, she and the defendant went shopping in Murfreesboro and then to Ms. Coffey's "sister's boyfriend's house." Later, Ms. Coffey went to the defendant's residence to celebrate the holiday with the defendant and their daughter, Chastity Gilbert. Ms. Gilbert's boyfriend, Chris Burgess, the defendant's brother, Roger Gilbert, Roger Gilbert's girlfriend, the defendant's niece, Brooklyn, "and some other white guy" were also at the gathering. Ms. Coffey, who acknowledged having consumed tequila and beer, said that the defendant "had tequila." Ms. Coffey recalled that when she "was playing with" the defendant's niece and "hitting her on her butt," the defendant became angry and told Ms. Coffey to leave. She testified that she left and that the defendant followed her out the door. Ms. Coffey claimed that the defendant pushed and choked her but "finally stopped," so she "went in the house to get my keys and my plate of food . . . but he jerked the plate of food out of my hand and threw it against the door." Ms. Coffey retrieved her keys and left the house.

Ms. Coffey testified that she got into her vehicle and drove "towards Well church" but decided to turn around because "I'm thinking Chastity and [the defendant] are going to get into it." She added, "I knew Chastity had got pissed off and she was going to be fussing with her daddy about me." When Ms. Coffey reached the defendant's residence, Mr. Burgess, who was standing outside, told her to leave. The defendant was standing in front of the house. Ms. Coffey said that she drove away and that, as she did so, she heard "[p]ow, pow, pow." She testified that she stopped her vehicle briefly because the sound scared her. She eventually drove home. When she returned to her own residence, she telephoned the police.

When the police arrived, she went with them to inspect her vehicle and observed "a skid mark on my door . . . and a little piece was off of it. Like a dent and a skid mark." She said that, to her knowledge, the mark was not on her car before she went to the defendant's residence.

Ms. Coffey testified that she thought she might have seen "some handgun" on the table in the defendant's residence on the day of the offenses "or the day before."

She said that she had "seen a case" for a gun but could not say "if it was that day or the day before." She claimed that she had asked the defendant why he had a gun but could not remember what he had said in response.

During cross-examination, Ms. Coffey acknowledged that it was possible that the mark could have been on her car before she went to the defendant's house, explaining, "I don't ever get on the passenger side of the car." Ms. Coffey also acknowledged that she was upset with the defendant because she had been asked to leave the family gathering on Christmas Eve and that she was not scared when she called the police but "was more mad than anything." Ms. Coffey testified that she did not see Ms. Gilbert outside when she returned to the defendant's residence.

The defendant's daughter, Chastity Gilbert, testified that on Christmas 2018 she and her boyfriend took their son to visit the defendant. Ms. Coffey, who is Ms. Gilbert's mother, was also there, as were "a couple other people." Ms. Gilbert said that when Ms. Coffey and the defendant "got into it, he asked her to leave." Ms. Gilbert said, "I don't really know what actually happened of the argument. I just know he told her to -- he wanted her to leave. So she was getting herself together to leave." Ms. Coffey left but came back inside shortly thereafter because she had forgotten her keys. Ms. Gilbert recalled that when Ms. Coffey came back inside, the defendant smacked a plate of food out of her hand. Ms. Gilbert testified that she asked the defendant why he had done that, and he said something about Ms. Coffey's behavior. At that point, Ms. Coffey left, and then Ms. Gilbert "went and grabbed my son and we left." She said that she "just didn't like the fact that he done that to her so I just wanted to leave."

As Ms. Gilbert prepared to leave, she saw that her mother had driven back "to make sure that we were I guess okay or something of the sort." Ms. Gilbert said that she did not hear the defendant make any comment when Ms. Coffey returned and said that she did not "believe" that she had told the police that the defendant commented that if Ms. Coffey "comes back out here, she's not going to leave." She acknowledged having provided a recorded statement to the police on December 25, 2018. Ms. Gilbert conceded that she told the police that "I think he said something like I don't -- basically he didn't want her to be back out there. He told her to leave. He asked her to leave and he didn't want her back out at his house." She said that she did not recall specifically telling the police that the defendant said that if Ms. Coffey returned, "she's not going to leave." Ms. Gilbert testified that when Ms. Coffey returned, Mr. Burgess "leaned out the door and he tells her to leave." Ms. Gilbert said that, at that point, she "heard a noise but I wasn't for sure what it was." Ms. Gilbert recalled telling the police that she told the defendant "you're not going to do anything to my mama, that's my mama." She explained, "Well, I mean, the reason I said that is, for one, he had already smacked the plate out of my mama's hand, so that was basically an altercation. I didn't want it to escalate further. That's my mother

and that's my father."

Ms. Gilbert denied having told the police that the defendant started shooting, saying, "I didn't say shooting because I didn't see him with no gun in his hand. I said I heard a noise and I heard them saying 'Tim' like calling my daddy's name." She denied having heard anyone tell the defendant to "put the gun down" but admitted that she told officers that the defendant had shot directly at Ms. Coffey. She added, "But the only reason I said that is later -- well, before I even talked to Officer [Cory] Medley, I seen my mother's car, so I assumed, since I seen something like that, he had shot at her, or whatever." Ms. Gilbert said that she did not "think" that she told officers that the defendant began shooting when Ms. Coffey turned by the church, saying that they were "already facing towards where the church was. She rode past and kept going while we were getting in the car."

Ms. Gilbert testified that the defendant's Cadillac was parked "on the front side of the house" but said that she did not "think" she had told officers that the defendant "came out of the trunk with a gun." After the State played a portion of the audio recording wherein Ms. Gilbert told Officer Medley that the defendant said "if she comes back out here, she's not going to leave," Ms. Gilbert acknowledged having made the statement. Upon hearing another portion of the audio recording, Ms. Gilbert again acknowledged having told Officer Medley that the defendant was shooting and explained that "the only reason I even said that is because I had seen my mother's car so I just assumed since what it had on it, he had shot at her." Upon hearing other portions from the recording, Ms. Gilbert admitted that she told Officer Medley that she heard others tell the defendant to put the gun down. Ms. Gilbert also admitted telling Officer Medley that the defendant came out of the trunk with a gun but insisted that she "didn't see him come out of no trunk with no gun," "[n]ot with my own eyes."

Ms. Gilbert acknowledged that she did not want to be in court and did not want to testify against the defendant. She admitted that the defendant supported her financially.

During cross-examination, Ms. Gilbert said that Ms. Coffey had been drinking on the day of the offenses. She explained that, when she told Officer Medley that Ms. Coffey had turned by the church, she was referring only to the sharp bend in the road near the church. She testified that the reason she told Officer Medley that the defendant had shot at Ms. Coffey was because she saw the mark on Ms. Coffey's car.

Pulaski Police Department Officer Cory Medley testified that he spoke with Ms. Coffey at her residence on December 24, 2018, after she telephoned 9-1-1. He said that because Ms. Coffey was obviously intoxicated, he decided "to get a driver to bring the vehicle to the police department" while he "transported Ms. Coffey to the police

-4-

department in my patrol vehicle." Officer Medley recalled that Ms. Coffey's vehicle, a black SUV, had a defect that, in his opinion as a police officer, had been caused by a bullet. Officer Medley attempted to interview Ms. Coffey at the police station, but "it was determined that she was intoxicated," so officers elected "to bring her back in for another interview on December 25, 2018."

Officer Medley testified that, following his interview with Ms. Coffey and his inspection of her vehicle on December 24, 2018, he went to the defendant's Keller Avenue residence with Lieutenant Justin Young to investigate. While there, Lieutenant Young "informed me that he had located some shell casings in the front yard of 1818 Keller Avenue." Officer Medley identified at trial the four .40 caliber shell casings that were collected by Lieutenant Joey Turner, who had also gone to the residence. In addition to collecting the shell casings, Officer Medley attempted to speak to the defendant's brother, Roger Gilbert, but Mr. Gilbert "[d]idn't really want to talk to me. And the rest of them was pretty uncooperative."

Based upon the information amassed during his investigation, Officer Medley obtained a warrant for the defendant's arrest on charges of "aggravated assault, reckless endangerment, and felon in possession of a handgun." He attempted to serve the warrant at the defendant's residence on December 25, 2018. Officer Medley said that he "knocked on the door and [the defendant] answered the door. I informed him that I had a warrant and he was going to have to go with me." Officer Medley testified that the defendant "started walking back into the residence," so Officer Medley "grabbed his left arm to attempt to put a handcuff on it. He started to spin away from me." At that point, Sergeant Jereme Robison, who had gone to the residence with Officer Medley, "came into the residence and grabbed a hold of" the defendant, and the three of them "ended up on the ground." The defendant "placed his arms underneath his body" and began "forcefully pulling away from us," so the officers "had to forcefully put his hand behind his back to place handcuffs on him." Officer Medley explained that he initially grabbed the defendant because "the incident involved a firearm, so, of course, we didn't want nobody to get out of our sight."

The State exhibited to Officer Medley's testimony a certified copy of the defendant's 2001 Giles County conviction for the possession of less than .5 grams of cocaine, a felony.

During cross-examination, Officer Medley acknowledged that he was not outside when Lieutenant Young located the shell casings. Instead, Lieutenant Young advised him of the discovery while he was inside the residence attempting to interview Mr. Gilbert. Officer Medley said that he photographed the casings, which were located "[i]n the grass area close to the front door," where they lay before Lieutenant Turner collected

them. Officer Medley said that he did not ask for permission to search the residence or the defendant's Cadillac and that he did not request forensic testing in this case. He admitted that he did not interview any of the neighbors. Officer Medley conceded that he "could tell" that Ms. Coffey was intoxicated during the December 24, 2018 interview. He acknowledged that although police officers "removed the door panel" from Ms. Coffey's car, they were "unable to locate the bullet fragments." He also acknowledged that it was possible that the shell casings had been in the defendant's yard for some time.

During redirect examination, Officer Medley agreed that the shell casings recovered from the defendant's yard appeared "relatively shiny and new."

Lieutenant Joey Turner testified that he recovered four shell casings from the defendant's front yard on December 24, 2018. During cross-examination, he said that he was in the kitchen area of the residence when he "was notified to come outside, that shell casings had been found in the front yard." He said that police officers "tried several different ways" but were unable to locate a "projectile" in Ms. Coffey's vehicle. He said that the Pulaski Police Department did not have access to lead testing equipment or trajectory rods that might have aided them in the determination whether the defect in Ms. Coffey's vehicle had been, in fact, caused by a bullet. Despite this, Lieutenant Turner testified during redirect-examination that it was his professional opinion that the defect had been caused by a bullet.

Chris Burgess testified on behalf of the defendant that on December 24, 2018, the defendant and Ms. Coffey were "arguing and [the defendant] asked her to leave and they just got into, like, just a little argument and we grabbed our little boy and put him in the car and left." He recalled that, after initially leaving, Ms. Coffey "circled around the block" and "then when she pulled back up," Mr. Burgess told her to "just leave, you know, because there's no sense in arguing." He said that, to his knowledge, no one fired any shots on that day. Mr. Burgess testified that he and Ms. Gilbert "pulled out right behind" Ms. Coffey. He agreed that he had told Officer Medley that nothing else had happened on the day of the incident.

During cross-examination, Mr. Burgess agreed that he had told Officer Medley that he did not want to get involved in this case. He denied that the defendant paid his bills but agreed that if Ms. Gilbert asked the defendant "for something, he gives her money."

During redirect-examination, Mr. Burgess said that he and Ms. Gilbert had their own home and that he worked. He said that the defendant had never asked him to testify in return for money.

The defendant testified that he did not have or fire a gun on Christmas Eve 2018. He said that, on that day, he and Ms. Coffey went Christmas shopping in Murfreesboro. After they returned to the defendant's house, Ms. Coffey expressed a desire to go to her sister's house. He decided to take a separate car because Ms. Coffey "got to getting drunk" and he did not "like to be around drunk people because they get to aggravating and, you know, just starting a bunch of old mess." The defendant returned home before Ms. Coffey, who arrived "[a]bout an hour later" "drunk, stumbling all through the house."

The defendant testified that when Ms. Coffey "kept on hitting on [him] while" he and his niece were using the computer, he told Ms. Coffey to leave because he did not want to be around her while she was drinking. He said that they began to argue because Ms. Coffey "keep telling me she's not going to leave." He testified that Ms. Coffey "hit me, then pushed me, and I grabbed her and pushed her out the door." When Ms. Coffey tried to come back inside, he asked her what she wanted, and "[s]he said, 'I want my food.'" The defendant said that he "come back with her food, going to give it [to] her. She hits me again so I threw it [a]t her." Ms. Coffey then got into her vehicle, and the defendant walked to the end of the sidewalk, at which point "she tries to run over me." The defendant said that he ran into the house, and Ms. Coffey "come back in [the] door. We get to arguing again. I push her out the door." At that point, Ms. Gilbert began to argue with the defendant about his treatment of Ms. Coffey, so he told her "if she don't like it and can't respect my decision, then you can leave." The defendant said that both Ms. Coffey and Ms. Gilbert left.

The defendant testified that on the following day, Christmas Day, he went to a Christmas gathering at his sister's house and returned home between 8:30 and 9:00 p.m. After he had been home "maybe five or ten minutes," Officer Medley arrived and said that officers needed to talk to him. The defendant said that he "opened the door, basically welcoming them on in my house." As he walked "across the living room floor . . . a couple steps in front of them," the defendant looked into a mirror and saw Officer Medley "taking his handcuffs out." The defendant insisted that, "when I turned around to face him and ask him what he's doing, he's trying to handcuff me." The defendant maintained that Officer Medley did not, at any point, tell him that he was under arrest or show him an arrest warrant. He admitted that, initially, he "wouldn't let" the officer handcuff him but said that he eventually acquiesced. He claimed that, as soon as he allowed himself to be handcuffed, Officer Medley "and his partner throw me in the floor, beats me up, fractured my skull." He said that the officers "mess[ed] my back up" so that it "will never be right anymore."

Officer Medley admitted on rebuttal that he did not tell the defendant at any point that he was under arrest. Instead, he explained, "I told him he had a warrant and he

was going to go with me."

Based upon this evidence, the jury convicted the defendant as charged of aggravated assault, reckless endangerment, unlawful possession of a weapon after having been previously convicted of a felony, and resisting arrest. Following a sentencing hearing, the trial court imposed a total effective sentence of six years' incarceration.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant contends that the trial court erred by permitting the State to amend Count 1 of the indictment over his objection. He also asserts that the trial court erred by admitting into evidence Ms. Gilbert's audio recorded statement to Officer Medley, arguing that the State called Ms. Gilbert for the primary purpose of admitting the otherwise inadmissible statement and that the State failed to satisfy the requirements for its admission as substantive evidence via Tennessee Rule of Evidence 803(26). The defendant challenges the sufficiency of the convicting evidence on grounds that the State failed to establish that he possessed, used, or displayed a firearm on the day of the offense. The defendant also avers that using a room maintained by the U.D.C. and ornamented with relics of the Confederacy for jury deliberations exposed the jury to extraneous prejudicial information and violated his constitutional rights to a fair trial by an impartial jury, due process, and equal protection under the law. Finally, he contends that the cumulative effect of the errors at trial entitle him to a new trial. We consider each claim in turn.

## I. Amendment of Indictment

On the first day of trial, the State moved to amend Count 1 of the indictment to include the "use of" a deadly weapon in addition to the "display of" a deadly weapon. The defendant objected on grounds that the amendment was untimely and that it was more than a technical amendment in that it actually altered the charged offense. The defendant noted that permitting the change would "destroy[] the primary defense . . . that he didn't cause her fear by display." The trial court concluded that "it is a technical amendment," noting that the State had asked to add "use" and not to change "display" to "use."

"Without the defendant's consent and before jeopardy attaches, the court may permit such an amendment if no additional or different offense is charged and no substantial right of the defendant is prejudiced." Tenn. R. Crim. P. 7(b)(2). That being said, however, "an indictment may not be amended 'by *broadening* the possible bases for conviction from that which appears in the indictment.'" *State v. Lindsey*, 208 S.W.3d 432, 440 (Tenn. Crim. App. 2006) (quoting *United States v. Miller*, 471 U.S. 130, 138 (1985)) (emphasis in *Miller*); *see also Stirone v. United States*, 361 U.S. 212, 215-17 (1960) (stating that "after an indictment has been returned its charges may not be broadened through

-8-

amendment except by the grand jury itself"). A trial court's ruling on a motion to amend an indictment is reviewed for an abuse of discretion. *State v. Kennedy*, 10 S.W.3d 280, 283 (Tenn. Crim. App. 1999).

Here, the indictment originally read:

> The Grand Jurors of Giles County, Tennessee, duly impaneled, and sworn upon their oath, present: That TIM GILBERT on or about the 24th day of December, 2018, in Giles County, Tennessee and before the finding of this indictment, did unlawfully, intentionally or knowingly by the display of a deadly weapon, to-wit: a handgun, cause Rotosha Coffey to reasonably fear imminent bodily injury by firing said gun in the presence of Rotosha Coffey, in violation of Tennessee Code Annotated Section 39-13-102, all of which is against the peace and dignity of the State of Tennessee.

Following the amendment, the charge alleged that the defendant committed the offense of aggravated assault "by the use or display of a deadly weapon" and retained the language alleging that he did so "by firing said gun in the presence of" Ms. Coffey. In our view, the inclusion of the phrase "by firing said gun" necessarily implicated the "use" of a firearm, and, consequently, the indictment as originally drafted charged the defendant with the use of a firearm, albeit without specifically including the word "use." Consequently, the trial court did not err by permitting the amendment because the amendment "complained of added nothing new to the grand jury's indictment and constituted no broadening." *Miller*, 471 U.S. at 145.

## II. Ms. Gilbert's Recorded Statement

The defendant next asserts that the trial court erred by permitting the State to call Ms. Gilbert for the primary purpose of admitting her otherwise inadmissible statement to Officer Medley and to admit the entire audio recording of Ms. Gilbert's statement as substantive evidence via Tennessee Rule of Evidence 803(26). The State contends that the defendant waived plenary consideration of this issue by failing to lodge a contemporaneous objection. In the alternative, the State avers that the trial court did not err.

Prior to trial, the defendant moved the trial court to exclude the statements provided to Officer Medley by both Ms. Gilbert and Ms. Coffey, arguing that both contained inadmissible hearsay. At the pretrial motions hearing, the prosecutor indicated that Ms. Gilbert had refused to meet with her and that the State had had difficulty locating Ms. Gilbert to serve her with a subpoena to appear at trial. The defendant insisted that Ms.

Gilbert's statement was hearsay, and the prosecutor replied:

> I am not going to try to elicit any hearsay intentionally. I do think that if these are recorded statements and they are inconsistent, then potentially I may try 803(26) again, so -- I may use it for impeachment purposes or some other purpose, or if it falls, you know, out of bounds of hearsay for some other purpose, something like that, so.

When the defendant specifically objected to Officer Medley's conveying the substance of the statement to the jury, the State agreed that it would not ask Officer Medley to do so. The trial court ruled that the officer "just can't say what they told him unless the door is opened otherwise."

While discussing other issues on the first day of trial, the prosecutor indicated to the trial court that she had had an intern "take off the first three minutes and 30 seconds" containing Officer Medley's interview of Mr. Burgess from the single audio recording that contained interviews with both Mr. Burgess and Ms. Gilbert "because it's a very real possibility that I'm going to have to impeach my own witness with her recorded statement." The prosecutor added that she intended to "potentially maybe seek to introduce it under 803(26)." The defendant noted that it was suspicious that the State had twice invoked the exception under 803(26) as potential avenue of admission for Ms. Gilbert's recorded statement but said nothing further.

During Ms. Gilbert's direct examination testimony, the State asked Ms. Gilbert if she had told Officer Medley that the defendant said "something to the effect of, if she comes back out here, she's not going to leave." Ms. Gilbert equivocated, saying first that she did not "believe" that she had said that to Officer Medley because she did not remember the defendant's "saying nothing like that." She then said that she did not "think I put it in those words. I think he said something like don't -- basically, he didn't want her back out there." She said again that she did not recall having used that specific language when speaking to Officer Medley.

Ms. Gilbert admitted that she told Officer Medley that she told the defendant "you're not going to do anything to my mama, that's my mama."

Ms. Gilbert denied saying that the defendant "start[ed] shooting," insisting that she "didn't say shooting because I didn't see him with no gun in his hand. I said I heard a noise and I heard them saying 'Tim' like calling my daddy's name." She also denied telling the officer that she heard someone tell the defendant to "put the gun down" and said that she did not "think" she had told him the defendant "came out of the trunk

with a gun." She admitted, however, having told him that the defendant was shooting directly at Ms. Coffey.

At that point, the prosecutor asked to play part of Ms. Gilbert's recorded statement, and the defendant objected on hearsay grounds. The trial court overruled the objection. After the State played a portion of the audio recording wherein Ms. Gilbert told Officer Medley that the defendant said "if she comes back out here, she's not going to leave," Ms. Gilbert acknowledged having made the statement. Upon hearing another portion of the audio recording, Ms. Gilbert again acknowledged having told Officer Medley that the defendant was shooting and explained that "the only reason I even said that is because I had seen my mother's car so I just assumed since what it had on it, he had shot at her." Upon hearing other snippets from the recording, Ms. Gilbert admitted that she told Officer Medley that she heard others tell the defendant to put the gun down. Ms. Gilbert also admitted telling Officer Medley that the defendant came out of the trunk with a gun but insisted that she "didn't see him come out of no trunk with no gun," "[n]ot with my own eyes." At the conclusion of Ms. Gilbert's direct examination, the prosecutor passed the witness but said that she would be "asking for a jury out for an 803(26) evaluation."

Following the defendant's cross-examination of Ms. Gilbert, the prosecutor indicated that she intended to ask the court for a jury-out hearing to determine the statement's admissibility under Rule 803(26). The trial court expressed confusion at "the procedure you are doing" but indicated that it wanted to continue with the proof and hold the hearing "later." The prosecutor agreed, and the defendant did not object. The trial then proceeded, with the State calling two more witnesses, Officer Medley and Lieutenant Turner, before resting its case. The defendant moved for judgment of acquittal, and the court indicated that it wanted to conduct a *Momon* colloquy first. At that point, the State asked the court for a jury-out hearing to determine whether Ms. Gilbert's recorded statement would be admissible as substantive evidence pursuant to Rule 803(26).

The trial court agreed to hold a jury-out hearing "relative to the testimony of Ms. Gilbert," and the State called Officer Medley as a witness. Officer Medley testified that Ms. Gilbert appeared to be sober and clear headed and that she had "possibly" had the night to sleep between the incident and the interview on December 25, 2018. He said that nothing at the time gave him the impression that Ms. Gilbert was not being honest. He said that Ms. Gilbert's statement was consistent with the version of events provided by Ms. Coffey.

During cross-examination, Officer Medley conceded that Ms. Gilbert had "possibly" had time to discuss the incident with Ms. Coffey. He said that he recorded the interviews with both Ms. Gilbert and Mr. Burgess with his cellular telephone because there

was no one available to give him access to the recording equipment at the police station.

The State argued that it had established by a preponderance of the evidence that Ms. Gilbert's statement was made under circumstances indicating trustworthiness, noting that she had given the statement to a uniformed police officer at the police station soon after the incident. The defendant argued that "there are enough atypical details to this interview," including the fact that it "took place in the interview room but [was not] filmed" and that it took place at the same time as Mr. Burgess's interview, to undermine its trustworthiness. The trial court concluded, again without any analysis, "that Ms. Gilbert's prior statement was made under circumstances indicating trustworthiness." The State then moved the audio recording of the interview into evidence, noting again that an intern had removed "the first three minutes and 30 seconds, which is Chris Burgess." When the jury returned, the trial court informed the jury that it had

> added an exhibit, exhibit eight, that you can take back and listen to. The Court has ruled that the statement of Chastity Gilbert, Christmas Day, 12/25/18, now comes into evidence. And so we are going to send that back. You can play it if you would like and we will send a computer to [do] that with, if there is a request.

After deliberating for approximately 25 minutes, the jury asked to listen to the audio recording. They returned their verdict about half an hour later.

### A. Waiver

Initially, we disagree with the State's assertion that the defendant waived plenary consideration of this issue by failing to lodge a contemporaneous objection. The defendant asserts that he adequately challenged the admission of Ms. Gilbert's audio recorded statement by moving to exclude it prior to trial and by objecting when it was initially offered. We agree. "[W]he[n] the record . . . on a motion in limine clearly presents an evidentiary question and whe[n] the trial judge has clearly and definitively ruled" on the motion, an objection when the challenged evidence is offered at trial is unnecessary to preserve the issue for appellate review. *State v. McGhee*, 746 S.W.2d 460, 462 (Tenn. 1988); *see also State v. Alder*, 71 S.W.3d 299, 302 (Tenn. Crim. App. 2001). When, however, "issues are only tentatively suggested or the record [is] only partially and incompletely developed in connection with a motion in limine," the failure to lodge an objection during trial carries with it the risk that the issue has not been properly preserved. *McGhee*, 746 S.W.2d at 462; *see also State v. Hawkins*, 519 S.W.3d 1, 48 (Tenn. 2017). Here, the defendant raised the issue prior to trial, objected to the statement when it was initially offered, objected to the trial court's finding that the statement satisfied the

-12-

prerequisites for admission via Rule 803(26), and raised the issue in his motion for new trial. Under these circumstances, we will apply plenary review to the defendant's challenge to the admission of Ms. Gilbert's statement.

### B. Purpose in Calling Ms. Gilbert

Although "[t]he credibility of a witness may be attacked by any party, including the party calling the witness," Tenn. R. Evid. 607, "[a] party may not call a witness to testify for the primary purpose of introducing a prior inconsistent statement that would otherwise be inadmissible," *State v. Jones*, 15 S.W.3d 880, 892 (Tenn. Crim. App. 1999); Tenn. R. Evid. 607, Advisory Comm'n Comment ("Decisional law prohibits a lawyer from calling a witness knowing the testimony will be adverse to the lawyer's position-solely to impeach that witness by an inconsistent statement."). To determine whether there has been a violation of this rule, this court considers "whether the prior statement and the testimony were inconsistent, whether the party calling the witness was aware the witness had disavowed the previous statement, and whether evidence existed to show the witness had been called for the sole purpose of impeachment." *State v. Rayfield*, 507 S.W.3d 682, 698-99 (Tenn. Crim. App. 2015) (citing *Jones*, 15 S.W.3d at 892; *Mays v. State*, 495 S.W.2d 833, 836-37 (Tenn. Crim. App. 1972); *State v. Harold Francis Butler*, No. E2014-00631-CCA-R3-CD, 2015 WL 2233122, at *7-8 (Tenn. Crim. App., Knoxville, May 11, 2015); *State v. Deundrick Laran Coble*, No. W2001-00039-CCA-R3-CD, 2002 WL 31259501, at *3 (Tenn. Crim. App., Jackson, Aug. 30, 2002); *State v. Roy L. Payne*, No. 03C01-9202-CR-00045, 1993 WL 20116, at *1-2 (Tenn. Crim. App., Knoxville, Feb. 2, 1993)).

In this case, the the State indicated as early as the February 27, 2020 motion hearing that it anticipated seeking admission of Ms. Gilbert's statement under Rule 803(26), noting that Ms. Gilbert had refused to meet with the prosecutor and had eluded service. The prosecutor stated that Ms. Gilbert was "an essential witness" and that she had "met with [Ms. Gilbert] in sessions" at the first setting of the case but did not disclose the content of that discussion. Ms. Gilbert did not appear for the second setting of the case in the sessions court. At the hearing on the motion for new trial, the prosecutor stated that the case against the defendant was dismissed in the general sessions court because Ms. Gilbert did not appear for the preliminary hearing. The prosecutor noted that the State had had difficulty "getting in touch with Ms. Gilbert" following that initial meeting in the sessions court, which, she said, "happens a lot in cases of domestic violence, family violence, that type of thing." She admitted that when she finally spoke with Ms. Gilbert on February 28, 2020, Ms. Gilbert refused to meet with the prosecutor. On the first day of trial, the prosecutor, while discussing the proposed amendment to Count 1, indicated that "the proof will be, based on Ms. Gilbert's statement to law enforcement, was that her father, Tim Gilbert, went to his vehicle and saw Rotosha Coffey drive back by and comes out of

-13-

the trunk with a gun and fires the shot." When the court asked, "So somebody is going to see him with a gun?" the prosecutor replied again that Ms. Gilbert had given a statement "saying that she saw her father come out of the trunk with a gun and he was shooting directly at her mother." When the trial court asked if Ms. Gilbert was going to testify at trial in a manner that would support a finding that the defendant used a firearm, the prosecutor replied only that "[s]he was served." Later, while discussing the late disclosure of Mr. Burgess's exculpatory statement, the prosecutor again noted that "it's a very real possibility that I'm going to have to impeach my own witness with her recorded statement." The prosecutor may not have, as she insisted, known exactly "what [Ms. Gilbert] was going to say," but she was clearly on notice that Ms. Gilbert did not intend to testify consistently with the statement she had provided to Officer Medley. Certainly, this is not a case where the State was deceived by Ms. Gilbert and surprised by her inconsistent testimony. *See Rayfield*, 507 S.W.3d at 699 ("Based upon the prosecutor's statement to the court about the State's preparing Mr. Rayfield for his trial testimony and Mr. Rayfield's deception relative to the content of his trial testimony, we conclude that the [d]efendant has not shown that the State was aware, when it called Mr. Rayfield as a trial witness, that Mr. Rayfield had disavowed his written statement."); *Coble*, 2002 WL 31259501, at *3 ("Indeed, it appears that the prosecution was misled by Ervin into believing that at trial, Ervin would affirm his pre-trial statement. Under the circumstances, there is nothing in the record of this case to indicate that Ervin was called to the stand as a mere ruse to get his pre-trial statement into evidence.").

In our view, the prosecutor's indication before the trial began that she anticipated impeaching Ms. Gilbert and entering her statement to Officer Medley as substantive evidence specifically via Rule 803(26) coupled with her evasive answers about Ms. Gilbert's anticipated testimony and the fact that Ms. Gilbert had failed to attend the preliminary hearing and had refused to meet with the State to discuss her potential trial testimony established that the prosecutor called Ms. Gilbert as a witness for the primary purpose of introducing her otherwise inadmissible statement. The trial court should not have allowed the State's impeachment of Ms. Gilbert, which "was calculated to and did serve . . . to put before the jury the out of court statements." *Mays*, 495 S.W.2d at 837.

Moreover, considered in light of the proof presented at trial, we cannot say that the error was harmless. As the prosecutor admitted even prior to trial, Ms. Gilbert's testimony was crucial to the State's case because it provided the only direct evidence that the defendant actually possessed a firearm and that he fired it at Ms. Coffey. Neither Mr. Burgess nor Ms. Coffey saw the defendant fire a gun. Ms. Coffey's vague and equivocal testimony about having seen either a gun or a gun case either in the defendant's car or on a table in his house either on the day of the offense or the day before lacked the specificity sufficient to support a conviction for unlawful weapon possession, reckless endangerment, or aggravated assault as alleged in the indictment, which specifically asserted that the

-14-

defendant had fired a gun at Ms. Coffey. The presence of fired shell casings in the defendant's front yard was certainly circumstantial evidence that *someone* had fired a gun in the yard *at some time*, but that evidence, even when considered alongside testimony from Ms. Gilbert and Ms. Coffey that they heard a noise, does not establish that the defendant fired a gun at Ms. Coffey. Similarly, although the police officers expressed a belief that the defect on Ms. Coffey's vehicle was caused by a bullet, Ms. Coffey testified that the mark could have been on there prior to the offense date. In fact, Ms. Coffey testified that she had not even seen the mark until it was pointed out to her by the officers. Ms. Coffey did not testify that she heard or felt a bullet strike the vehicle. Indeed, no witness testified to hearing or seeing a bullet strike Ms. Coffey's car. No bullet was ever recovered from the vehicle despite an extensive search. Thus, the evidence was insufficient to support the defendant's convictions of aggravated assault, reckless endangerment, and unlawful weapon possession without Ms. Gilbert's testimony.

### C. Admission via Rules 613(b) and 803(26)

Additionally, even if we had concluded that the State did not call Ms. Gilbert for the purpose of impeaching her with her pretrial statement, we would still reverse the defendant's conviction based upon the trial court's erroneously admitting the recorded statement in its entirety.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise by law." *Id.* 802. Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule of inadmissibility of hearsay. Our supreme court has confirmed that "[t]he standard of review for rulings on hearsay evidence has multiple layers." *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). The "factual and credibility findings" made by the trial court when considering whether a statement is hearsay, "are binding on a reviewing court unless the evidence in the record preponderates against them." *Id.* (citing *State v. Gilley*, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008)). "Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one [of] the exceptions to the hearsay rule—are questions of law subject to de novo review." *Kendrick*, 454 S.W.3d at 479 (citing *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)); *see also Gilley*, 297 S.W.3d at 760 (stating that because "[n]o factual issue attends" the trial court's determination whether a statement is hearsay, "it necessarily is a question of law"). "If a statement is hearsay, but does not fit one of the exceptions, it is inadmissible, and the court must exclude the statement. But if a hearsay statement does fit under one of the exceptions, the trial court may not use the hearsay rule to suppress the statement." *Kendrick*, 454 S.W.3d at 479; *see also Gilley*, 297

S.W.3d at 760-61.

In addition to the exceptions for admission in Rules 803 and 804, Evidence Rule 613 provides a potential avenue for the admission of an out-of-court statement. Under Rule 613, "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same." Tenn. R. Evid. 613(b); *see State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998) (confirming that "extrinsic evidence remains inadmissible until the witness either denies or equivocates as to having made the prior inconsistent statement"). "Extrinsic evidence of a prior inconsistent statement remains inadmissible when a witness unequivocally admits to having made the prior statement" because "[t]he unequivocal admission of a prior statement renders the extrinsic evidence both cumulative and consistent with a statement made by the witness during trial." *Martin*, 964 S.W.2d at 567. On the other hand, extrinsic evidence of a prior inconsistent statement will be admissible when a witness denies making the statement, equivocates about having made the statement, or testifies that he or she does not recall making the prior inconsistent statement. *Id.* (citing *State v. Kendricks*, 947 S.W.2d 875, 881 (Tenn. Crim. App. 1996)).

Generally, because they contain hearsay, "prior inconsistent statements offered to impeach a witness are to be considered only on the issue of credibility, and not as substantive evidence of the truth of the matter asserted in such statements." *State v. Reece*, 637 S.W.2d 858, 861 (Tenn. 1982). Tennessee Rule of Evidence 803(26), however, provides an exception to the hearsay rule permitting a prior inconsistent statement of a witness that is "otherwise admissible under Rule 613(b)" to be used as substantive evidence if the declarant testifies at trial; the statement is recorded, signed by the declarant, or given under oath; and "made under circumstances indicating trustworthiness." Tenn. R. Evid. 803(26). The latter finding requires the trial court to "conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness." *Id.* The Advisory Commission Comments to Rule 803(26) provide that "[t]o be considered as substantive evidence the statement must first meet the traditional conditions of admissibility which include the procedural aspects of inconsistent statements as addressed in Rule 613."

Here, Ms. Gilbert unequivocally admitted having given a statement to Officer Medley and acknowledged that she knew that Officer Medley had recorded the statement. Nevertheless, she either denied or equivocated about telling Officer Medley: that the defendant said "something to the effect of, if she comes back out here, she's not going to leave"; that the defendant "start[ed] shooting"; that she heard someone tell the defendant to "put the gun down"; and that the defendant "came out of the trunk with a gun." Consequently, those portions of her statement directly contradicting those statements were admissible as impeachment evidence under the terms of Rule 613(b). Because Ms.

Gilbert admitted having said that she told Officer Medley that the defendant said "you're not going to do anything to my mama, that's my mama" and that the defendant was shooting directly at Ms. Coffey, extrinsic evidence of those statements in the form of her recorded statement to Officer Medley was not admissible under the terms of Rule 613(b). *See Martin*, 964 S.W.2d at 567.

Because Ms. Gilbert's statement was audio recorded and because Ms. Gilbert testified and was subject to cross-examination at trial, the four assertions within the recorded statement to Officer Medley that satisfied the criteria for admission via Evidence Rule 613(b) were subject to admission as substantive evidence under the terms of Rule 803(26) upon a ruling by the trial court at a jury-out hearing that the statement was "made under circumstances indicating trustworthiness." Although we agree that the procedure employed in this case with regard to the 803(26) hearing was unorthodox, we cannot say that the procedure per se violated the terms of the rule. It is true that the State had indicated to the trial court that it had rested its case-in-chief before asking for a jury-out hearing, but it had not formally rested its case in the presence of the jury. The court held a hearing out of the presence of the jury, and the defendant was afforded an opportunity to cross-examine Officer Medley about the circumstances under which Ms. Gilbert provided the statement. His testimony indicated that Ms. Gilbert provided the statement to him at the police station and that he was wearing his uniform at the time. Both Officer Medley, at the jury-out hearing, and Ms. Gilbert, during direct examination at trial, stated that they knew the statement was being audio recorded. Additionally, Officer Medley explained that he had recorded the interviews on his cellular telephone because, due to the holiday, he had no access to the recording equipment at the police station. Ms. Gilbert, however, was not called as a witness at the hearing and was not asked during direct examination about the circumstances that led her to give the statement to Officer Medley. Nevertheless, we cannot say that, under the circumstances, the trial court erred by finding that the statement was made under circumstances indicating trustworthiness. Accordingly, the trial court did not err by concluding that the four inconsistent portions of Ms. Gilbert's pretrial statement satisfied the criteria for admission as substantive evidence under Rule 803(26).

As indicated above, because Ms. Gilbert admitted having said that she told the defendant "you're not going to do anything to my mama, that's my mama" and that the defendant was shooting directly at Ms. Coffey, extrinsic evidence of those statements was not admissible under the terms of Rule 613(b), *see Martin*, 964 S.W.2d at 567, and, accordingly, not admissible as substantive evidence under the terms of Rule 803(26). Unfortunately, rather than redact the recording to feature only the four inconsistent statements, the trial court admitted the recording in its entirety, and the record establishes that the jury specifically asked to listen to the recording during deliberations. This was error.

Again, as indicated above, Ms. Gilbert's pretrial statement was the only evidence that the defendant shot at Ms. Coffey or, indeed, even possessed a gun. Without Ms. Gilbert's pretrial statement, the proof established that the defendant and Ms. Coffey exchanged words and got into an altercation after the defendant asked Ms. Coffey to leave. Ms. Coffey heard what she believed to be gunshots, but she did not stop. She did not see the defendant with a gun. There was a defect on the side of Ms. Coffey's car that the police opined had been caused by a bullet, but Ms. Coffey could not say that the defect had not been on the car before the day of the offense. Moreover, she did not testify that she heard or felt any impact on her vehicle. Ms. Gilbert admitted telling the police that the defendant had shot at Ms. Coffey but denied actually having seen him do so. Both Ms. Coffey and Ms. Gilbert acknowledged that they were angry with the defendant for asking Ms. Coffey to leave the Christmas party when they gave their statements to the police. Under these circumstances, we cannot say that the erroneous admission of the entirety of the statement was harmless.

### III. Sufficiency

The defendant challenges the sufficiency of the convicting evidence, arguing that the State could not have established that he possessed or used a firearm "without Chastity Gilbert's unsworn prior recorded statement to law enforcement being admitted as evidence." Ms. Gilbert's statement was admitted into evidence, however, and its inclusion into the sufficiency of the evidence calculus is not affected by whether this evidence should have been inadmissible. *See State v. Longstreet*, 619 S.W.2d 97, 100-01 (Tenn. 1981) (holding that even inadmissible evidence goes into a calculation of the sufficiency of the evidence).

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[a] person commits aggravated assault who . . . [i]ntentionally or knowingly commits an assault as defined in § 39-13-101, and the assault

. . . [i]nvolved the use or display of a deadly weapon." T.C.A. § 39-13-102(a)(1)(A)(iii). "A person commits an offense who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." *Id.* § 39-13-103(a). "A person commits an offense who unlawfully possesses a firearm, as defined in § 39-11-106, and . . . [h]as been convicted of a felony drug offense." *Id.* § 39-17-1307(b)(1)(B). "It is an offense for a person to intentionally prevent or obstruct anyone known to the person to be a law enforcement officer . . . from effecting a stop, frisk, halt, arrest or search of . . . the defendant, by using force against the law enforcement officer or another." *Id.* § 39-16-602(a).

Examined in the light most favorable to the State, the evidence adduced at trial established that the defendant and Ms. Coffey quarreled at a Christmas Eve gathering at the defendant's house and that the quarrel culminated in the defendant's asking Ms. Coffey to leave. Ms. Coffey left but drove back by the defendant's house, at which point the defendant fired a gun at her while others were present in the front yard of the house. Ms. Coffey testified that she drove away quickly after hearing what she believed to be gunshots because she was afraid. Officer Medley testified that the defendant forcibly resisted being handcuffed when the officer went to his residence to arrest him, and the defendant admitted that he initially refused to allow the officers to handcuff him, claiming that he did not know he was under arrest. A certified copy of the judgment established the defendant's prior conviction of a felony drug offense. This evidence was sufficient to support the defendant's convictions.

*IV. Jury Room Claims*

The defendant next contends that having the grand and petit juries deliberate "in an inherently prejudicial Confederate Jury Room violated" his constitutional right "to a fair trial, his right to an impartial jury, his right to due process, and right to equal protection of the law," arguing that the jury room utilized in Giles County violates the 14th Amendment's "protection against state-sponsored racial discrimination" and the 6th Amendment's "right to a jury trial"; violates the state and federal constitutional right to trial by "an impartial jury"; violates "evidentiary standards"; "constitutes extraneous prejudicial information and improper outside influence"; and "violates the trial court's duty of judicial impartiality." The State asserts only that the defendant has waived plenary consideration of this issue by failing to challenge the conditions of the jury room prior to trial. In its amicus brief, the Tennessee Association of Criminal Defense Lawyers ("TACDL"), noting that "[m]ultiple courts have recognized the racially hostile and disruptive nature of the Confederate flag," argues that "a jury's exposure to Confederate Icons denies the defendant a fair trial free of extraneous prejudicial information and improper outside influence."

We begin with a description of the jury room and its contents as established by photographs exhibited to the hearing on the motion for new trial. The first photograph depicts the door that leads into the jury room. The glass panel in the door bears the insignia of the U.D.C.: the first national flag used by the Confederate States of America, commonly referred to as the "Stars and Bars,"[1] which consists of two large red bars at the top and the bottom separated by a broad white bar with a blue canton at the top hoist corner containing a circle of seven white stars representing each of the original Confederate states, encircled by a wreath of gold with a ribbon at the bottom bearing the number 61 on the left and the number 65 on the right.[2] The door is inscribed "U.D.C. Room" in gold paint.

The second, third, and fifth photographs exhibited to the hearing show a large, framed flag hanging on the wall of the U.D.C. Room directly across from the entry door. The Confederacy changed its official flag three times before the end of the Civil War. Because the "Stars and Bars" was similar to the design of the American flag, that flag caused confusion on the battlefield, prompting the Confederate army to employ battle flags, the most recognizable of which is the Southern Cross design—a diagonal or x-shaped blue cross, trimmed in white, on a field of red adorned with 13 stars—that has become most closely associated with the Confederacy in the modern era.[3] The Confederacy later integrated the Southern Cross battle flag into its official national flag as a canton at the top hoist corner on a field of white. That flag, referred to as the "Stainless Banner" was replaced by a new design shortly before the fall of the Confederacy. This new design, referred to as the "Blood Stained Banner," also features the Southern Cross battle flag as a canton at the top hoist corner on a field of white but adds a broad red bar on the fly edge of the field of white. The flag on the wall of the U.D.C. Room is of the "Blood Stained Banner" design. The size of the flag and its location within the U.D.C. Room make it immediately visible to any person upon entering the room. A plaque affixed to the flag's frame reads, "Confederate Flag Property of Giles County Chapter #257 UDC."

The third, fourth, sixth, seventh, and eighth photographs show framed

---

[1] *See* Encyclopedia Britannica, *Flag of the Confederate States of America*, https://www.britannica.com/topic/flag-of-the-Confederate-States-of-America (last visited October 21, 2021), for full description of the Stars and Bars.

[2] "The badge adopted by the U.D.C. is of gold and consists of the flag of the Confederacy, known as the 'Stars and Bars' surrounded by a wreath of laurel with the letters U. D. C. under its folds, and on the loop of the ribbon beneath it the years 61-65, and to honor its significance, it is forbidden to make it into hat pins or other ornaments." Hyde, Anne Bachman, *An Historical Account of the United Daughters of the Confederacy: Origin, Objects and Purposes* 5 (issued by Memorial Chapter No. 48 Little Rock, Ark. 1959).

[3] *See* Encyclopedia Britannica, *Flag of the Confederate States of America*, https://www.britannica.com/topic/flag-of-the-Confederate-States-of-America (last visited October 21, 2021), for a full description and history of the flags employed by the Confederacy.

portraits.  One, a framed portrait of Jefferson Davis, who served as the president of the Confederacy, hangs on the wall adjacent to the flag wall and is also visible to any person upon entering the room.  A plaque affixed to the portrait reads, "President Jefferson Davis Owned by Giles County Chapter #257, UDC."  Another framed portrait bears a plaque that reads "General John C. Brown Owned by Giles County Chapter #257, UDC."

Those same photographs as well as the ninth photograph show a framed letter on the wall adjacent to the portrait of General Brown.  The letter, dated March 25, 2005, is addressed to Ms. Cathy Gordon Wood, then president of the Giles County Chapter of the U.D.C. from Ms. Winifred D. Cope, President General of the U.D.C. from 2004-2006.  The letter reads:

> Dear Ms. Wood:
>
> Thank you for your letter informing me of the goals of your chapter.  How exciting that you wish to be more visible in Giles County!  With the replacing of the panel on the door, you will be continuing a tradition of the UDC, namely, memorial.
>
> It is my understanding from your letter that the room in the Giles County Courthouse has been a UDC room since 1930's.  The accident concerning the panel happened between the time the Red Cross used the room during World War II, and present day.  As there is no indication of the responsibility of the damage, and your chapter is willing to accept the cost, I assume all expenses will be borne by the chapter.
>
> I therefore give Giles County Chapter #257, Pulaski, Tennessee full authority to replace the clear glass door panel with a frosted glass panel, with the following inscription - "UDC Room" with the UDC emblem located above the lettering.
>
> As members of the United Daughters of the Confederacy®, we must continue to honor our Confederate Veterans, and share the history of the War Between the States.  I thank you and your chapter for your support to the General Organization as we remember the objects of the UDC-Historical, Educational, Benevolent, Memorial, and Patriotic.

At the hearing on the motion for new trial, Giles County Circuit Court Clerk

Natalie Oakley testified that petit juries in Giles County deliberate and the grand jury meets in "the U.D.C. Room." She said that U.D.C. stands for The United Daughters of the Confederacy, that "U.D.C Room" is painted on the door, and that the room contains "a [C]onfederate flag hanging on the wall." Ms. Oakley said that there was another "room that is right outside this door to the courtroom to the left and it's typically used as a break room but there is a table in there where a jury could deliberate." She said that she "knew the name of the room and what was in there" but that she had not "consciously studied the room." During cross-examination, Ms. Oakley said that, when not being used by a jury, the U.D.C. Room was open to the public.

Giles County Grand Jury Foreman Sam T. Collins testified that he had been grand jury foreman for 14 years and that, during that time, he had had no indication that the Confederate memorabilia in the U.D.C. Room had affected the judgment of the grand jurors. He said that grand jurors had never discussed the items and that the race of the defendant had never become an overt factor in the decision-making process. He said that the room was in the same condition it was when he became foreman.

The defendant argued that having the jury deliberate in a room festooned with Confederate memorabilia and maintained by the U.D.C. implied that the court "subscribes to the confederate principles" and that to many, "the confederacy and racism go hand in hand." He asserted that "the symbols on that wall do nothing but embolden" jurors to act on racial animus. He claimed that the constitution required that juries conduct deliberations in "an impartial environment, free from distractions." He also pointed out that strict rules attend the placing of evidence in the jury room.

The State claimed that the defendant waived the issue by failing to raise it before the jury was sworn. Additionally, the State argued that the fact that the defendant had been acquitted in a previous, unrelated case and granted probation in others suggested that the defendant had not been prejudiced by the material in the jury room. The trial court agreed and concluded that the defendant had failed to prove his claim. The judge specifically noted that juries had deliberated in the U.D.C. Room in Giles County for the 43 years that the judge had been active in the legal community there.

*A. Waiver*

The State asserts that the defendant waived plenary review of the use of the U.D.C. Room by failing to object prior to trial. We disagree. As will be discussed more fully below, the jury should not be exposed to extraneous information, and the burden does not rest with the defendant to ensure that this is so. Moreover, the location of jury deliberations is not one of the issues that must be raised prior to trial. *See* Tenn. R. Crim. P. 12(b)(2).

## B. *Extraneous Prejudicial Information*

"Both the United States and Tennessee Constitutions guarantee criminal defendants the right to a trial by an 'impartial jury.'" *State v. Hugueley*, 185 S.W.3d 356, 377 (Tenn. 2006) (citing U.S. Const. amend. VI; Tenn. Const. art. I, § 9). "Far from being a mere procedural formality, jury trials provide the citizens with the means to exercise their control over the Judicial Branch in much the same way that the right to vote ensures the citizens' ultimate control over the Executive and Legislative Branches." *State v. Smith*, 418 S.W.3d 38, 44-45 (Tenn. 2013) (citing *Walsh v. State*, 166 S.W.3d 641, 649 (Tenn. 2005)). Our supreme court has defined an "unbiased and impartial jury" as "one that begins the trial with an impartial frame of mind, that is influenced only by the competent evidence admitted during the trial, and that bases its verdict on that evidence." *Smith*, 418 S.W. 3d at 45 (citing *Durham v. State*, 188 S.W.2d 555, 558 (Tenn. 1945); *State v. Adams*, 405 S.W.3d 641, 650-51 (Tenn. 2013)). "Jurors must render their verdict based only upon the evidence introduced at trial, weighing the evidence in light of their own experience and knowledge." *State v. Adams*, 405 S.W.3d 641, 650 (Tenn. 2013) (citing *Caldararo ex rel. Caldararo v. Vanderbilt Univ.*, 794 S.W.2d 738, 743 (Tenn. Ct. App. 1990)).

The validity of a verdict returned by a jury that "has been subjected to either extraneous prejudicial information or an improper outside influence . . . is questionable." *Adams*, 405 S.W.3d at 650 (citing *State v. Blackwell*, 664 S.W.2d 686, 688 (Tenn. 1984)). "Extraneous prejudicial information has been broadly defined as information coming from without." *Adams*, 405 S.W.3d at 650 (citation and internal quotation marks omitted). "A party challenging the validity of a verdict must produce admissible evidence to make an initial showing that the jury was exposed to extraneous prejudicial information or subjected to an improper outside influence." *Adams*, 405 S.W.3d at 651. "Extraneous prejudicial information" encompasses "the form of either fact or opinion that was not admitted into evidence but nevertheless bears on a fact at issue in the case," and improper outside influence is considered "any unauthorized 'private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury.'" *Id.* at 650-51 (quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954)). Upon a showing "that the jury was exposed to extraneous prejudicial information or an improper outside influence, a rebuttable presumption of prejudice arises and the burden shifts to the State to introduce admissible evidence to explain the conduct or demonstrate that it was harmless." *Adams*, 405 S.W.3d at 651 (citing *Walsh*, 166 S.W.3d at 647).

The challenged information in this case consists of a large, framed Confederate flag, two portraits of Confederate leaders, and a framed letter from the national leader of the U.D.C. Because the flag was the most visible and most instantly recognizable of the items on the wall—one would likely be hard-pressed to find a citizen who would

recognize Jefferson Davis, let alone John C. Brown, on sight—we will concern ourselves primarily with that item.  "The use of an emblem or flag to symbolize some system, idea, institution, or personality, is a short cut from mind to mind.  Causes and nations, political parties, lodges and ecclesiastical groups seek to knit the loyalty of their followings to a flag or banner, a color or design."  *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 632 (1943).  "Flags themselves have the capacity to communicate messages pertaining to, say, a government's identity, values, or military strength."  *Shurtleff v. City of Boston*, 986 F.3d 78, 88 (1st Cir. 2021) (citations omitted).  The flag displayed in the jury room is no different.  Its original purpose was to "knit the loyalty" of those in the Confederate states "to a flag" that conveyed the political ideals of the Confederacy.  *See also* James Forman, Jr., *Driving Dixie Down: Removing the Confederate Flag from S. State Capitols*, 101 Yale L.J. 505, 513-15 (1991) ("The flag was initially designed as a rallying symbol for Confederate troops heading into battle.").

To determine the political ideals of the Confederacy that could be conveyed by the flag in this case, we look to documents created at the time its founding.  At the time they adopted the various Articles of Secession, each of the Confederate states publicly identified the reasons behind the decision to secede from the Union, and the documents published by the Confederate states identified the right to hold black people in chattel slavery as central to the Southern way of life and, thus, paramount among those justifications.  These documents not only defended slavery, but endorsed it fully using dehumanizing and racist language.  *See* Evans & Cogswell, Printers to the Convention, *Declaration of the Immediate Causes which Induce and Justify the Secession of South Carolina from the Federal Union*, p. 1, 8 (1860)[4]; E. Barksdale, State Printer, *Journal of the State Convention and Ordinances and Resolutions adopted in January 1861*, p. 86 (1861) (Mississippi)[5]; Boughton, Nibbet & Barnes, State Printers, *Journal of the Public and Secret Proceedings of the Convention of the People of Georgia*, p. 104 (1861)[6]; Dyke & Carlisle, *Journal of the Proceedings of the Convention of the People of Florida*, p. 18 (1861)[7]; *Declaration of the Causes which impel the State of Texas to recede from the Federal Union—also the Ordinance of Secession*, p. 3 (1861)[8]; Wyatt M. Elliott, Printer, *Journal of the Acts and Proceedings of a General Convention of the State of Virginia*, p. 93 (1861)[9]; Wood, Hanleiter, Rice & Co., *The History and Debates of the Convention of*

---

[4]    A digitized version of original source document may be viewed at https://digital.scetv.org/teachingAmerhistory/pdfs/DecImmCauses.pdf.

[5]    Digitized version at https://archive.org/details/journalofstateco00miss/page/86/mode/2up.

[6]    Digitized version at https://archive.org/details/journalofpublics00geor/page/104/mode/2up.

[7]    Digitized copy at https://archive.org/details/journalofproceed00flor/page/n3/mode/2up.

[8]    Digitized copy at https://archive.org/details/declarationofcau00texa/page/3/mode/2up?q.  Texas also published her declarations in various broadsides, a digitized example of which is available via the Library of Congress at https://www.loc.gov/resource/rbpe.34604300/?sp=1&st=text.

[9]    Digitized copy at https://archive.org/details/journalofactspro00virg/page/n97/mode/2up?q.

*the People of Alabama*, p. 78 (1861).[10]  The Confederate Constitution provided that "[i]n all [new Confederate] territory the institution of negro slavery, as it now exists in the Confederate States, shall be recognized and protected by Congress and by the Territorial government."  Const. of the Confederate States of America of 1861, art. IV, § 3, cl. 3.  The Confederate Constitution further enshrined the "right of property in negro slaves" by prohibiting the passage of any legislation that might impair that right, *see id.*, art. I, § 9, cl. 4[11]; by providing its citizens with "the right of transit and sojourn . . . with their slaves and other property" without threat to "the right of property in said slaves," *see id.* art. IV, § 2, cl. 1; and by requiring that any "slave . . . escaping or lawfully carried into another . . . be delivered up on claim of the party to whom such slave belongs," *see id.* art. IV, § 2, cl. 3.  These documents establish that slavery and the subjugation of black people are inextricably intertwined with the Confederacy and the symbols thereof.  Such ideals, however, are antithetical to the American system of jurisprudence and cannot be tolerated.  "[D]iscrimination on the basis of race, 'odious in all aspects, is especially pernicious in the administration of justice.'"  *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 868 (2017) (quoting *Rose v. Mitchell*, 443 U.S. 545, 555 (1979)).

As the Supreme Court observed, however, "[a] person gets from a symbol the meaning he puts into it, and what is one man's comfort and inspiration is another's jest and scorn."  *Barnette*, 319 U.S. at 632-33; *Pleasant Grove City v. Summum*, 555 U.S. 460, 474 (2009) ("Even when a monument features the written word, the monument may be intended to be interpreted, and may in fact be interpreted by different observers, in a variety of ways.").  This case presents a perfect example.  As a symbol of the Confederacy, the Confederate flag represents, at least in part, the attempt to perpetuate the subjugation of black people through chattel slavery.  The defendant and TACDL argue that the Confederate flag has become a symbol of racism and white supremacy, particularly given its adoption by groups such as the Ku Klux Klan.  The manner of its keeping, however, shows that the U.D.C. views the flag as an important historical artifact worthy of preservation and honor.[12]  The State makes no argument on this point.  Whatever the message, the fact remains that flags have been used "throughout history to communicate messages and ideas," *Shurtleff*, 986 F.3d at 88 (citing *Barnette*, 319 U.S. at 632; *Griffin v. Sec'y of Veterans Affs.*, 288 F.3d 1309, 1324 (Fed. Cir. 2002)), and the flag on the wall of the U.D.C. room is no different.

---

[10]     Digitized copy at https://archive.org/details/historydebatesof00smit/page/78/mode/2up.

[11]     Digitized copy at https://archive.org/details/constitutiono00conf/page/16/mode/2up?q and at https://archive.org/details/permanentconstit00conf/page/n5/mode/2up.

[12]     Notably, the U.D.C. was, at its inception, "a society" open only to "respectable white women who aided the South during the war or were related to men who honorably served their country, or materially aided the South during those stirring times."  Mo. Div. United Daughters of the Confederacy, *Reminiscences of the Women of Missouri During the Sixties* 7.

That the flag appears in the county courthouse only deepens the imbroglio. The record contains no evidence to explain how the U.D.C., a private organization,[13] came to possess a dedicated room in the Giles County Courthouse in, as the letter claims, the 1930s. The letter establishes that the U.D.C. emblem and inscription were added to the glass panel of the door in 2005 at the expense of the Giles County Chapter of the U.D.C., but the record does not contain any evidence that explains how the group obtained permission to make such changes to a government building. "The right to use government property for one's private expression depends upon whether the property has by law or tradition been given the status of a public forum, or rather has been reserved for specific official uses." *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 761 (1995) (citing *Cornelius v. NAACP Legal Def,e & Ed. Fund, Inc.*, 473 U.S. 788, 802-03 (1985)). When "a governmental entity manipulates its administration of a public forum close to the seat of government (or within a government building) in such a manner that only certain . . . groups take advantage of it," it "creat[es] an impression of endorsement." *Pinette*, 515 U.S. at 766.

Although the U.D.C. is a private organization and although the flag belongs to that organization, the location of the flag and the other items within the courthouse in a room used on a regular basis, which location has not been historically viewed as a public forum, clothes all of the items, including the flag in particular, with the imprimatur of state approval. *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 217 (2015) ("The fact that private parties take part in the design and propagation of a message does not extinguish the governmental nature of the message or transform the government's role into that of a mere forum-provider."). "Public property which is not by tradition or designation a forum for public communication" may be reserved by the state for "its intended purposes, communicative or otherwise." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983). By contrast, "[a]n open forum . . . does not confer any imprimatur of state approval." *Widmar v. Vincent*, 454 U.S. 263, 274 (1981). When, however, the government accepts "a privately donated monument" and places it on government property not typically used as a forum for public communication, the government "engages in expressive conduct." *Summum*, 555 U.S. at 476. Indeed, "as a general matter, forum analysis simply does not apply to the installation of permanent monuments," which this display certainly appears to be, "on public property." *Summum*, 555 U.S. at 480.

To be sure, "it frequently is not possible to identify a single 'message' that is

---

[13] *See* United Daughters of the Confederacy, https://hqudc.org/history-of-the-united-daughters-of-the-confederacy/ (last visited September 22, 2021) ("The UDC was incorporated under the laws of the District of Columbia on July 18, 1919" and currently exists as "a nonprofit organization and it meets the requirements of the Internal Revenue Service Code 501(c)(3) as a tax-exempt organization.").

conveyed by an object or structure, and consequently, the thoughts or sentiments expressed by a government entity that accepts and displays such an object may be quite different from those of either its creator or its donor." *Summum*, 555 U.S. at 476; *see also Texas v. Johnson*, 491 U.S. 397, 417 (1989) ("We never before have held that the Government may ensure that a symbol be used to express only one view of that symbol or its referents."). Nevertheless, when a government creates or permits the creation of a permanent display by a private organization, it has engaged in government speech. *See Summum*, 555 U.S. at 476. "An observer need not be 'obtuse' to presume that an unattended display on government land in a place of prominence in . . . a government building either belongs to the government, represents government speech, or enjoys its location because of government endorsement of its message." *Pinette*, 515 U.S. at 785-86 (Souter, J., concurring) (citation omitted). Accordingly, the communication at issue in this case is best understood as government speech, giving it great weight and influence. Discussing the "vital" role played by a court officer, our supreme court has observed that "[c]ourt officers act as representatives of the court, and they must recognize the official character of their position will cause their comments to carry great weight in the eyes of the jury." *Walsh*, 166 S.W.3d at 650. Any communication perceived to originate from the court in its official capacity will "carry great weight in the eyes of the jury."

Even though the communication was a form of government speech and regardless of the message the Giles County government meant to convey, in the context of a criminal trial, it constitutes extraneous information. "A government entity has the right to 'speak for itself,' "is entitled to say what it wishes," "and to select the views that it wants to express." *Summum*, 555 U.S. 467-68 (quoting *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229 (2000); *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995), and citing *Rust v. Sullivan*, 500 U.S. 173, 194 (1991); *Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in judgment)). Importantly, however, in the context of court proceedings both judges and jurors "must be—*and must be perceived to be*—disinterested and impartial." *Smith*, 418 S.W.3d at 45 (citing *State v. Hester*, 324 S.W.3d 1, 51 (Tenn. 2010); *Gribble v. Wilson*, 49 S.W. 736, 736 (Tenn. 1899)) (emphasis added). The specter of racial prejudice that might be ascribed to the flag in the U.D.C. room is particularly troublesome given that "the jury is to be a criminal defendant's fundamental protection of life and liberty against race or color prejudice." *Pena-Rodriguez*, 137 S. Ct. at 868 (quoting *McCleskey v. Kemp*, 481 U.S. 279, 310 (1987)) (citation and internal quotation marks omitted). As the Supreme Court has observed, "[p]ermitting racial prejudice in the jury system damages 'both the fact and the perception' of the jury's role as 'a vital check against the wrongful exercise of power by the State.'" *Id.* (citations omitted). Thus, although the government may choose to convey any message that it wants to the general public, it may not convey *any* message at all to the jurors in a criminal trial. Because Giles County may not convey any message to the jury, we conclude that permitting the jury to deliberate in a room filled with

Confederate memorabilia exposed the jury to extraneous information or improper outside influence.[14] "This extraneous information raised a presumption of prejudice and shifted the burden to the State to show the information was harmless in order to sustain the verdict." *Walsh*, 166 S.W.3d at 647.

Having concluded that the jury was exposed to extraneous information or improper outside influence, we must determine whether the State has rebutted the presumption of prejudice flowing from that exposure. To do so, we consider:

> (1) the nature and content of the information or influence, including whether the content was cumulative of other evidence adduced at trial; (2) the number of jurors exposed to the information or influence; (3) the manner and timing of the exposure to the juror(s); and (4) the weight of the evidence adduced at trial.

*Adams*, 405 S.W.3d at 654. A reviewing court must "consider all of the factors in light of the ultimate inquiry—whether there exists a reasonable possibility that the extraneous prejudicial information or improper outside influence altered the verdict." *Id.* (citing *Walsh*, 166 S.W.3d at 649).

The State presented no proof to rebut the defendant's assertion at the hearing on the motion for new trial. Instead, the State argued, and the trial court agreed, that the fact that another jury in an unrelated case had deliberated in the U.D.C. Room and acquitted the defendant somehow established that the items in the U.D.C. Room held no sway over the jury. That the defendant was acquitted by a different jury on unrelated charges has no bearing at all on the question whether the jury in this case was exposed to extraneous prejudicial information or improper outside influence. We are also unpersuaded that Mr. Collins' testimony that no grand juror had ever exhibited open racial animus prompted by viewing the Confederate flag in the U.D.C. Room rebutted the presumption of prejudice or

---

[14] Display of the American flag and the Tennessee flag in the courtroom do not constitute extraneous communications because lawyers and judges take an oath to uphold the state and federal constitutions and the laws of both the United States and the State of Tennessee. Jurors compose the very backbone of the American system of jurisprudence, *Walsh*, 166 S.W.3d at 650 (stating that '[j]ury service is the highest obligation of citizenship [and] should be an interesting and rewarding experience to be looked back on with interest and pleasant recollection by those who are privileged to be selected) (citations and internal quotation marks omitted), and are sworn to apply the law. The presence of these flags serve as a constant reminder of these weighty duties. *See Johnson*, 491 U.S. at 405 (stating that "[t]he very purpose of a national flag is to serve as a symbol of our country); *see also United States v. Eichman*, 496 U.S. 310, 321 (1990) (stating that the American flag "uniquely symbolizes the ideas of liberty, equality, and tolerance— ideas that Americans have passionately defended and debated throughout our history. The flag embodies the spirit of our national commitment to those ideals").

-28-

somehow indicated that no juror had ever noticed the items. As the United States Supreme Court has observed,

> The stigma that attends racial bias may make it difficult for a juror to report inappropriate statements during the course of juror deliberations. It is one thing to accuse a fellow juror of having a personal experience that improperly influences her consideration of the case . . . . It is quite another to call her a bigot.

*Pena-Rodriguez*, 137 S. Ct. at 868-69. Nevertheless, we will assess whether the State has rebutted the presumption of prejudice using the factors from *Adams*.

"As to the first factor, the nature and content of the information or influence is best determined by an inquiry into the identities of the parties involved, the substance of the communication, and how the exchange of information occurred." *Adams*, 405 S.W.3d at 654. This case is unique in that the defendant has challenged a feature of the Giles County Courthouse itself as constituting extraneous prejudicial information. We have already detailed the Confederate memorabilia displayed in the U.D.C. Room. The photographs exhibited to the hearing clearly establish that the large, framed Confederate flag hung on the wall directly across the room from the door and was, in consequence, within the direct sight line of any person entering the room. We have also concluded that any message communicated by the flag qualifies as government speech, giving it great weight in the eyes of the jury. The jury was exposed to the information by the court itself when it chose to utilize the U.D.C. Room for juror deliberations.

As for "the number of jurors exposed to the information or influence," the State asserts that the defendant presented no evidence that any juror actually saw the flag or other items. This argument, however, strains the bounds of credulity. The photographs exhibited to the new trial hearing clearly show that the flag in particular is visible to all who enter the room. Any person who chose to walk into the room or, while in the room, glance at the window, could not help but see the flag. As to "the manner and timing of the exposure to the jurors," the record establishes that the jury retired to the jury room during every recess, for every meal, and for its deliberations. Essentially, the entire experience of the jurors was permeated by the presence of the extraneous communication.

We are unpersuaded by the State's argument that the record is inadequate or that the defendant failed to establish his claim of extraneous prejudicial information by failing to call any of the jurors to testify about whether and how they were affected by the items. "The predominant view among other jurisdictions is that juror testimony regarding the subjective effect of extraneous information or outside influence on the juror's internal

thoughts or deliberative processes is not permitted." *Walsh*, 166 S.W.3d at 648 (citations omitted). "Tennessee Rule of Evidence 606(b) permits juror testimony to establish the fact of extraneous information or improper influence on the juror; however, juror testimony concerning the effect of such information or influence on the juror's deliberative processes is inadmissible." *Id.* at 649; *see also* Tenn. R. Evid. 606(b). Moreover, the defendant did not bear the burden of establishing that the jury was affected by the extraneous information. Instead, once the defendant established the fact of the extraneous information, the burden lay with the State to prove that the jury was not affected by the information.

As indicated above, the evidence of the defendant's guilt was legally sufficient but far from overwhelming. In consequence, the weight of the evidence adduced at trial does not support a conclusion that the State rebutted the presumption of prejudice created by the jury's exposure to extraneous communication in this case. Because the defendant established that the jury was exposed to extraneous information or improper outside influence and because the State failed to sufficiently rebut the presumption of prejudice, the defendant is entitled to a new trial.

Because we have concluded that the defendant is entitled to a new trial based upon the jury's exposure to extraneous prejudicial information, we need not consider his claims that principles of due process or equal protection entitle him to a new trial. "It is a fundamental rule of judicial restraint" that "a reviewing court will not reach constitutional questions in advance of the necessity of deciding them." *Three Affiliated Tribes of Fort Berthold Rsrv. v. Wold Eng'g, P.C.*, 467 U.S. 138, 157 (1984); *see also Burton v. United States*, 196 U.S. 283, 295 (1905) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.").[15]

## C. Grand Jury

The defendant asserts that permitting the grand jury to deliberate in the U.D.C. Room "infected the framing of the indictment" with "racial discrimination." Because the grand jury has investigative powers and because its deliberations are not circumscribed by the rules of evidence, *see* Tenn. R. Crim. P. 6, we cannot fathom that any information the grand jury considers would be deemed "extraneous."

## V. Cumulative Error

Because we have determined that the defendant is entitled to a new trial based

---

[15] The question whether the U.D.C. Room should remain in the Giles County Courthouse and in its current condition is not before this court. It is sufficient that we have concluded that permitting the jury to deliberate in the U.D.C. Room resulted in the jury's being exposed to extraneous information and that the State failed to rebut the presumption of prejudice flowing therefrom.

upon the erroneous admission of Ms. Gilbert's pretrial statement and the jury's exposure to extraneous information, we need not address the defendant's claim that the cumulative effect of the errors deprived him of the right to a fair trial.

## VI. Conclusion

The trial court erred by permitting the State to call Ms. Gilbert as a witness for the primary purpose of impeaching her with her otherwise inadmissible statement to Officer Medley and by admitting Ms. Gilbert's recorded statement in its entirety as substantive evidence under Rule 803(26). The defendant is entitled to a new trial because the erroneous admission of the statement cannot be classified as harmless. The defendant established that the jury was exposed to extraneous information by conducting its deliberations in the U.D.C. Room. Because the State failed to sufficiently rebut the presumption that the defendant was prejudiced by the jury's exposure to the Confederate memorabilia in the U.D.C. Room, the defendant is entitled to a new trial. Accordingly, we reverse the judgments of the trial court and remand the case for a new trial.

_____
JAMES CURWOOD WITT, JR., JUDGE